Lorraine Corporation (Dissolved) v. Commissioner.
Lorraine Corp. v. Commissioner
Docket No. 60461.
United States Tax Court
T.C. Memo 1958-141; 1958 Tax Ct. Memo LEXIS 86; 17 T.C.M. (CCH) 719; T.C.M. (RIA) 58141; July 21, 1958
*86 Depreciation: Maintenance costs. - Property acquired by a real estate corporation in 1937 as a part of its business holdings, held, not to have lost its character as property used in the trade or business until it leased the property to a nonprofit foundation for $1 per year. Depreciation sustained and maintenance expenditures prior to the date of such lease held deductible; such items after that date held not deductible. Richard E. Thigpen, Esq., 525 North Tryon Street, Charlotte, N. C., and Robert L. Hines, Esq., for the petitioner. Harvey S. Jackson, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the fiscal years ended June 30, 1952 and 1953 and for the fiscal period *87 ended February 28, 1954 in the respective amounts of $1,499.20, $2,011.40 and $1,266.18. The issues are whether the respondent erred (a) in disallowing as deductions the amounts claimed for the above periods as expenses, which represented depreciation deductions and maintenance costs with respect to one parcel of realty, and (b) in allowing in lieu of such deductions lesser amounts as contributions subject to the provisions of section 23(q) of the Internal Revenue Code of 1939. A subsidiary issue of whether the petitioner sustained a net operating loss for the short fiscal period ended in 1954 depends upon whether it is entitled to the deductions that it claimed for that period. Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. The petitioner (Lorraine Corporation, now dissolved) was organized under the laws of North Carolina on June 19, 1936 by I. D. Blumenthal to engage in the business of renting, leasing, holding and dealing in real estate. It maintained its principal office at Charlotte, North Carolina. For the fiscal years ended June 30, 1952, June 30, 1953, and the fiscal period ended February 28, 1954, it filed its income *88 tax returns with the director of internal revenue for the district of North Carolina. At all times material hereto I. D. Blumenthal owned all of the capital stock of the petitioner until September 4, 1953 when he donated it to The Blumenthal Foundation for Charity, Religion, Education and Better Inter-Faith Relations (hereinafter referred to as the Foundation). Thereafter until February 28, 1954, all of the petitioner's stock was owned by the Foundation with the exception of three qualifying shares. The petitioner ceased doing business on February 28, 1954 at which time all of its assets, subject to its liabilities, were transferred to the Foundation. The petitioner was dissolved by a certificate of dissolution issued on May 31, 1954, but under the laws of North Carolina its corporate existence was continued for three years after dissolution. For many years prior to its dissolution and throughout the taxable periods under review the petitioner owned several tracts of real estate, including a 14-family apartment house known as the Lorraine Apartments, several dwellings and several business or industrial properties in Charlotte and surrounding Mecklenburg County, North Carolina, *89 from which it received rents. During the taxable periods the petitioner owned lands which it purchased in 1937 in McDowell and Mitchell Counties in North Carolina known as "Wildacres." The property was acquired for investment, sale and the production of income through rental and for the purpose of diversifying the petitioner's holdings. Wildacres is located near Little Switzerland, North Carolina, and consists of approximately 1,400 acres of land with a 40-room hotel building and other houses thereon. From 1937 until 1945 for periods of a few months in those years, the petitioner rented Wildacres to a summer art school and other enterprises. Since 1946 the petitioner has permitted religious and other charitable groups to use Wildacres without the payment of rent for periods of about one week each during the summer months. The groups using Wildacres for religious, education and recreation retreats during the summers of 1951, 1952 and 1953 were as follows: 1951 Season
June 24-30
NCCJ - Civitan Institute on Hu-
man Relations
July 2-6
Ministers Fellowship Week
July 8-12
N.C. B'nai B'rith Institute of
Judaism
July 16-22
St. Martin's Episcopal Church,
Charlotte, N.C.
July 23-29
Selwyn Avenue Presbyterian
Church, Charlotte, N.C.
Aug. 1-5
District No. 5 B'nai B'rith In-
stitute of Judaism
Aug. 6-12
N.C. Association of Jewish
Youth
Aug. 13-19
Charlotte Jewish Community
1952 Season
June 22-28
Civitan Institute on Human Re-
lations
June 30-July 4
Ministers Fellowship Week
July 6-12
Golden Years Club
July 13-17
N.C. B'nai B'rith Institute on
Judaism
July 21-27
St. Martin's Episcopal Church,
Charlotte, N.C.
July 24-Aug. 3
Inter-denominational Family
Group
Aug. 6-10
District No. 5 B'nai B'rith In-
stitute of Judaism
Aug. 11-17
N.C. Jewish Youth Conference
Aug. 18-24
N.C. Jewish Leadership Con-
ference
1953 Season
June 7-13
Civitan Institute on Human Re-
lations
June 14-27
United Synagogue Youth (2
weeks)
June 29-July 3
Ministers Fellowship Week
July 5-11
Inter-denominational Fellow-
ship Week
July 12-16
N.C. B'nai B'rith Institute of
Judaism
July 20-26
St. Martin's Episcopal Church,
Charlotte, N.C.
July 27-Aug 2
Institute in Intergroup Educa-
tion (for public school edu-
cators)
Aug. 5-9
District No. 5 B'nai B'rith In-
stitute of Judaism
Aug. 10-16
N.C. Associate of Jewish Youth
Aug. 17-23
N.C. Jewish Leadership Week
*90 Each of the respective groups set forth above paid its own costs and expenses for food, food services and program activities. In the mountains of North Carolina there are a number of retreats for religious and other organizations. The petitioner's president invited and permitted the above-named groups to use the Wildacres facilities with the thought that some group might be interested in purchasing the property. At various times inquiries were received concerning the property and some inquirers inspected the facilities, but no sale resulted therefrom. In addition to the use of Wildacres by the above-listed groups, the Radiator Specialty Company of Charlotte used Wildacres for its annual house party for which use the petitioner received the following amounts for the periods indicated: July 13-15, 1951
$ 875.00
July 18-20, 1952
1,254.50
July 17-19, 1953
1,518.00
Radiator Specialty Company is a North Carolina corporation which had 502 shares of capital stock outstanding of which 376 shares were owned by I. D. Blumenthal. Radiator Specialty Company is the only organization which has paid rent to the petitioner for the use of Wildacres since 1945. The above-mentioned *91 Foundation was created by I. D. Blumenthal about May 15, 1953. On June 1, 1953 a lease agreement was entered into between the petitioner and the Foundation whereby Wildacres, with the exception of a dwelling house thereon and appurtenances thereto which were reserved for the use of I. D. Blumenthal, was leased to the Foundation for a period of five years ending May 31, 1958. The stipulated rental was $1 per year. Under the lease agreement the petitioner was to pay the premiums on insurance covering the premises and to pay all taxes on the property. The Foundation was to maintain the property. However, the Foundation did not have funds with which to maintain the property and the cost of maintenance and repairs was borne by the petitioner during the fiscal period ended February 28, 1954. The depreciation sustained on Wildacres and the expenses paid by the petitioner with respect thereto during the taxable periods were as follows: Fiscal year
Fiscal year
Fiscal period
ended 6-30-52
ended 6-30-53
ended 2-28-54
Depreciation
$1,027.42
$1,098.01
$ 771.34
Building supplies and repairs
802.84
1,500.88
5,482.15
Insurance
206.26
421.58
23.23
Labor and caretaker
2,507.21
2,026.93
Auto expense
62.42
231.99
Advertising
4.90
Power, lights, fuel, water
$ 170.05
$ 135.95
Miscellaneous
406.62
12.16
Maintenance
394.52
$5,577.34
$5,432.40
$6,276.72
*92 The respondent determined that the amounts set forth in the preceding paragraph were not ordinary and necessary expenses incurred in carrying on a trade or business. The respondent further determined that those amounts constituted additional contributions, subject to the limitations provided under section 23(q) of the Internal Revenue Code of 1939, and allowed as such contributions the amounts of $328.36, $392.48, and $222.14 for the respective fiscal years and fiscal period. The property known as Wildacres continued to be property held in connection with the petitioner's real estate business through May 31, 1953, but at that time it ceased to be property so held. Opinion The parties are in agreement as to the amount of expenditures made by the petitioner with respect to Wildacres and with respect to the depreciation thereon. The question presented is whether these amounts are deductible in full as claimed by the petitioner in its returns, partly as ordinary and necessary business expenses under section 23(a) of the Internal Revenue Code of 1939, and partly as depreciation under section 23(1). The respondent, in determining the deficiencies, disallowed the claimed deductions, *93 taking the position that the property in question was not, during the periods in question, held as a part of the petitioner's real estate business. However, in lieu thereof he allowed deductions in lesser amounts as contribution under section 23(q). [1]
*94 We are satisfied from the evidence that Wildacres was acquired by the petitioner for business purposes. The president of the petitioner testified that it was acquired for investment, to sell or rent, and to diversify the property holdings. The respondent does not question that it was acquired for business purposes. It is his position, however, that in 1946 the property was withdrawn from business purposes and remained so withdrawn throughout the taxable periods before us. At that time the petitioner commenced letting religious and other groups use the property during the summer months rent free. The petitioner's president testified that the property had not produced as much revenue as he had anticipated and that he invited the religious and other groups to use the property with the idea that they might be interested in purchasing it. During the taxable periods involved a relatively small amount of income was derived from renting the property during summer months to a Charlotte business organization for its annual house party. It has been held that "property once used in the business remains in such use until it is shown to have been withdrawn from business purposes." Kittredge v. Commissioner (C.A. 2), 88 Fed. (2d) 632. *95 See also Yellow Cab Co. of Pittsburgh v. Driscoll (Dist. Ct., W.D. Pa.), 24 Fed. Supp. 993, P. Dougherty Co., 5 T.C. 791, affd. in P. Dougherty Co. v. Commissioner (C.A. 4), 159 Fed. (2d) 269, Carter-Colton Cigar Co., 9 T.C. 219, and Alfred Kruse, 29 T.C. 463. In the last cited case we said that "mere discontinuance of the active use of the property does not change its character previously established as business property." Upon the evidence presented, including the testimony of the petitioner's president above-described, it is our conclusion, despite the fact that the property produced little revenue, and was occupied at times rent free by religious and other organizations, that it was still held by the petitioner as a part of its real estate business property throughout the periods here in question up to the date it was leased to the Foundation on June 1, 1953. The petitioner's president, who owned all of the petitioner's stock, created the Foundation on May 15, 1953. Under the lease agreement the property was leased to the Foundation at a nominal rental of $1 per year for a five-year period ending May 31, 1958. The *96 only obligation on the Foundation under the agreement was that of maintaining the property, which obligation it did not perform since it lacked adequate funds. On September 4, 1953, the petitioner's president donated all the stock of the petitioner to the Foundation. It seems obvious that at the time of entering into the lease the petitioner abandoned any profit motive insofar as this property was concerned. No rental profit in the usual business sense would be realized under this lease, and clearly such a lease would be deterrent to a sale of the property. The conclusion is inescapable that at that time the property was withdrawn from business purposes of the petitioner and that it was thereafter devoted to the purposes of the nonprofit Foundation in which the petitioner's president was interested. Accordingly, we hold that depreciation sustained on the property and expenditures made in connection therewith up to that date are deductible by the corporation, but that those items after that date are not deductible. As previously stated, the respondent allowed certain lesser amounts as deductions under section 23(q). In view of our conclusion that the petitioner is entitled to deductions *97 in the full amounts of depreciation sustained and expenditures made throughout the fiscal year ended June 30, 1952 and throughout the fiscal year ended June 30, 1953, up to May 31 of that year, it follows that the petitioner is not also entitled to deduct as charitable contributions any part of such amounts paid or accrued up to that date. However, since the respondent in the notice of deficiency has taken the view that the petitioner is entitled to deductions as contributions, and since no issue in regard thereto is raised, in the recomputation under Rule 50 appropriate amounts paid or accrued in the last month of the fiscal year ended June 30, 1953 and in the fiscal period ended February 28, 1954 will be allowed as deductions under section 23(q). Decision will be entered under Rule 50. Footnotes
1. The pertinent portions of the above-mentioned sections are as follows: SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In general. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *
(1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business * * *
(q) Charitable and Other Contributions by Corporations. - In the case of a corporation, contributions or gifts payment of which is made within the taxable year to or for the use of: [specified organizations] to an amount which does not exceed 5 per centum of the taxpayer's net income as computed without the benefits of this subsection. * * *↩